**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA ex rel.** | ) | |
| **BERNARD G. FERGUSON,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 07 C 5385** |
| | ) | |
| **NEDRA CHANDLER, Warden,** | ) | **Judge Rebecca R. Pallmeyer** |
| **Dixon Correctional Center,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION AND ORDER

In September 1992, Petitioner Bernard Ferguson shot and killed Michael Myles when a drug deal went awry. At the conclusion of a bench trial in April 1995, the court convicted Petitioner of first-degree murder, as well as two counts of attempted armed robbery, and sentenced him to forty years in prison. Petitioner unsuccessfully challenged his conviction on direct appeal, and, more than twelve years later, his protracted postconviction proceedings have finally ended in dismissal. Petitioner now seeks a writ of habeas corpus from this court, arguing that his constitutional rights were violated by the trial court's evidentiary rulings and by various shortcomings in his state court postconviction proceedings.

This is Petitioner's third habeas petition in federal court. The court dismissed the first two petitions, filed in 2000 and 2004, without prejudice, on the basis that Petitioner had not yet exhausted his state court remedies and that delay in resolution of his state petitions was the result of his own (or his counsel's) actions. He filed this third petition in 2007, but the court again rejected the argument that the State was causing inordinate delay. The court stayed the third petition pending the final adjudication of the state court postconviction petition. When those proceedings finally ended in 2010, Petitioner filed a supplemental habeas petition, alleging additional claims, and the court lifted the stay. For the reasons explained herein, all but one of the claims put forth in Petitioner's third habeas petition, and in his supplemental habeas petition, either fail to raise an

issue of constitutional or federal law or are procedurally defaulted. The only remaining claim—an alleged Confrontation Clause violation—is without merit. Therefore, the court dismisses the petition.

## **FACTUAL BACKGROUND**[1]

### I. **Crime and Conviction**

In the early morning of September 4, 1992, Petitioner closed down the liquor store where he worked part-time and went home to drink beer with his girlfriend, Rhonda Cook. (Direct Review Order at 1.) Petitioner also worked part-time as a police officer for the Village of Robbins, but he was serving a three-day suspension for wearing an earring and for preparing a "sloppy" report. (*Id.*; Br. and Arg. for Pl.-Appellee (hereinafter "State's Br. on Direct Review"), Ex. E to State Ct. R., at 12.) At around 4 a.m., Petitioner borrowed eight dollars from Cook and left his trailer (Direct Review Order at 1), seeking to purchase drugs.[2] (State's Br. on Direct Review at 7-8.)

---

[1] This court adopts the bench trial findings of fact as set forth in *People v. Ferguson*, No. 92 CR 22172, and as later recounted by the Illinois appellate court in *People v. Ferguson*, No. 1-95-2374. (Trial Tr., Ex. C to Resp't's Answer to the State Ct. R. [34] (Apr. 5, 1995); Feb. 11, 1997 Order ("Direct Review Order"), Ex. B to State Ct. R.); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.").

[2] Whether Petitioner was looking to purchase drugs was disputed at trial, but the state court's finding that he was is amply supported. Though at trial Petitioner denied ever using or trying to purchase drugs (Direct Review Order at 6), in his initial interview with Assistant State's Attorney ("ASA") Anna Demacopoulos, Petitioner admitted he was seeking to purchase cocaine. (State's Br. on Direct Review at 12.) Similarly, both White and Larry Williams told police that, on that morning, Petitioner approached them and inquired about purchasing drugs. (*Id.* at 3.) At trial both men initially claimed they could not recall the details of their interactions with Petitioner (*Id.* at 3-4), but after reading their handwritten statements, White and Larry Williams admitted having heard Petitioner say that he had eight dollars for "a rock," meaning cocaine. (*Id.*) Likewise, Rhonda Cook signed a written statement dated September 4, 1992, and testified before a grand jury on September 17, 1994, that Petitioner left the trailer seeking drugs. (State's Br. on Direct Review at 16.) She denied these prior statement at trial, but did testify that Petitioner returned home complaining that someone had sold him some "soap" (a slang term for bad drugs), and that he then retrieved the brown bag where he kept his revolver. (*Id.* at 4.) On appeal, the court noted that the trial court may have improperly considered Cook's statement to ASA Demacopoulos that Petitioner left to purchase drugs as substantive evidence, but that any error was harmless in light of the
(continued...)

2

On a residential street "not far away" from his trailer, Petitioner encountered George White and Larry Williams drinking beers on a front porch. (Direct Review Order at 1, 3, 5.) Petitioner told them, "I got 8 bucks for a rock"; while they conversed, Michael Myles and Corey Williams pulled up in a blue van.[3] (*Id.* at 2-3.) According to Petitioner's own statement to ASA Demacopoulos, he purchased a small bag of white powder from the men in the van for $9.80. (*Id.* at 4.) Shortly thereafter, Petitioner tasted the powder and realized it was "soap," *i.e.*, bad drugs. (*Id.*) He set out to find Myles and Corey Williams so he could recoup his money, and he quickly found their blue van stopped at a nearby railroad crossing. (*Id.* at 5.) Petitioner returned to his trailer, told Cook that someone sold him some "soap," and asked for the brown bag in which he typically kept his service revolver. (*Id.* at 4.) Cook handed him the bag and Petitioner again left the trailer. (*Id.*)

Petitioner returned to the tracks and found the blue van still there as Myles, the driver, and Corey Williams, the passenger, waited for a train to pass. (Direct Review Order at 5.) Petitioner got out of his car, approached the driver's side of the van with his gun drawn, and ordered the two men out of the van. (State's Br. on Direct Review at 8.) When Myles tried to drive away, Petitioner fired. (*Id.*) The bullet flew through the open driver's side window of the van; it struck Myles under his left arm, passed through his heart and lungs, and lodged itself on the right side of his chest cavity. (Trial Tr. at 69.) Somehow, Myles managed to keep driving. (State's Br. on Direct Review at 14.) Petitioner got back in his car and followed the van as it traveled a few more blocks before coming to a stop. (Direct Review Order at 2; State's Br. on Direct Review at 14.) Corey Williams jumped out and called for help. (Direct Review Order at 2.) At that point, Petitioner decided to

---

[2](...continued)
evidence.

Petitioner's intent to purchase drugs is relevant because it established motive for the shooting that followed, but the trial court emphasized that the purchase of drugs was of only peripheral importance when compared with Petitioner's other actions in perpetrating the murder of Myles. (Trial Tr. at 71.)

[3] There is no relation between Larry Williams and Corey Williams evident on the face of the record.

return home. (State's Br. on Direct Review at 14.) When police eventually arrived at the scene, they found Myles dead in the driver's seat of the van. (Direct Review Order at 2.)

After the shooting, Petitioner made his way home, discarding the empty shell casing in a wood pile near his trailer.[4] (State's Br. on Direct Review at 9.) He parked his car a block from home. (Direct Review Order at 2.) Once inside, Petitioner told Cook that he may have shot someone. (*Id.*) He listened to his police scanner and heard a description of his own car. (*Id.*; Trial Tr. at 70.) He inserted a new bullet into his revolver, replacing the spent cartridge he had removed. (State's Br. on Direct Review at 9.) Minutes later, Chicago Police Detectives Gerald McGovern, Roman Arbataitis, and George Winistorfer knocked on Petitioner's door. (Direct Review Order at 2; State's Br. on Direct Review at 10.) Petitioner let them in, showed them the revolver, and told them where he had thrown the spent casing, which the detectives retrieved. (State's Br. on Direct Review at 10.) Then, in an apparent effort to cooperate further, Petitioner accompanied the detectives to the police station so they could conduct a formal interview. (*Id.* at 11.)

ASA Demacopoulos also interviewed Petitioner at the station the morning after the shooting. According to her trial testimony, Petitioner told her that he left the trailer to make a few small repairs to his car and to purchase cocaine with the eight dollars Cook had given him. (State's Br. on Direct Review at 12.) Petitioner admitted giving Myles and Corey Williams $9.80 for a small bag of cocaine, and explained that after they drove off, he tasted it and realized he had purchased bad drugs. (*Id.* at 13.) Petitioner told Demacopoulos that, after realizing this, he headed out, saw the van by the railroad tracks, retrieved his revolver, and returned to the tracks. (*Id.*) He approached the driver's side with his gun drawn, asked for his money back, and when Myles started to drive off, he fired his gun. (*Id.*)

Demacopoulos testified that, at the conclusion of the interview, Petitioner agreed to sign a

---

[4]    The record before the court does not include a complete transcript of the trial proceedings, but the court presumes these facts originate from the trial testimony of Cook and from Detectives McGovern and Winistorfer, who also testified at trial. (*See, e.g.*, State's Br. on Direct Review at 22.)

statement and she left to prepare the document. (*Id.* at 14.) When Demacopoulos returned, Petitioner reviewed the written statement line by line and she made changes as Petitioner requested them. (*Id.*) He asked her to delete the segment describing his initial effort to buy cocaine from Larry Williams and White and to add a statement that, when he did buy cocaine from Corey Williams and Myles, he thought he saw one of the men reach for an object that may have been a weapon. (State's Br. on Direct Review at 14.) He also amended his statement to say that, as he approached the van at the train crossing, Myles began to drive toward him, and Petitioner yelled "'Hold, stop, stop.'" (*Id.* at 14-15; Direct Review Order at 5.) Petitioner did not initial any of the changes as Demacopoulos made them. (State's Br. on Direct Review at 15.) After reviewing the final version of the statement, Petitioner declined to sign it until his lawyer reviewed it.[5] (*Id.*) ASA Demacopoulos and Detective McGovern initialed the changes in Petitioner's presence before leaving. (*Id.*)

Petitioner was charged with three counts of murder[6], two counts of attempted armed robbery, and two counts of armed violence. (State's Br. on Direct Review at 7.) He waived his right to a jury trial and instead opted for a bench trial that took place in April 1995. (*Id.* at 17.) At the trial, Petitioner testified that he fired his weapon in self-defense. (Direct Review Order at 6-7.) According to Petitioner's account at trial, he left his home in the early hours of September 4, 1992, to get air for his tires and water for his radiator and to pick up food for Cook. (*Id.* at 5.) The electrical system in his car failed in front of the house where White and Larry Williams were sitting on the porch and drinking beers. (*Id.*) Petitioner claimed that, as he chatted with the two men and worked under the hood of his car, a blue van drove by and one of the passengers yelled something

---

[5]     Though the record is unclear, it appears that Petitioner never signed the statement and that it was not admitted at trial.

[6]     The fact that Petitioner was charged with three counts of first-degree murder was an error. Even after his trial, the mittimus showed that Petitioner had been convicted of three counts of first-degree murder; as described below, the state later amended the mittimus to reflect only one first-degree murder conviction. (Am. Agreed Mot. for Summ. Disposition, Ex. T to State Ct. R., ¶ 10.)

unintelligible at him. (*Id.*)

Petitioner claimed that, after fixing the car's electrical system, he stopped by a gas station for air and water and was on his way to a fast food restaurant when he pulled up behind the same blue van at a train crossing. (Direct Review Order at 5.) At that point, Petitioner testified, his car again died. (*Id.*) As Petitioner returned to working under the hood of his car, Petitioner recalled, Corey Williams approached him from behind, pulled out a gun, and demanded money. (*Id.* at 5-6.) Petitioner stated that as he gave Corey the eight dollars, the van made a U-turn. (*Id.* at 6.) When Corey returned to the van, Petitioner retrieved his service revolver from his car, identified himself as police, and ordered Corey and Myles to freeze. (*Id.*) Petitioner testified that although Myles raised his hands, Corey grabbed the wheel of the van and started driving toward Petitioner, aiming a gun in Petitioner's direction. (*Id.*) Petitioner testified that he fired his own revolver in self-defense just as the van swerved away from him. (*Id.*) On the stand, Petitioner also stated that he routinely listened to the police scanner for his job, that he had never purchased or taken drugs, and that both of his jobs required random drug testing. (*Id.*) In fact, Petitioner sought to introduce evidence that, at the time of the shooting, he was expecting the Robbins Police Department to administer a random drug test in the near future, but the court found that testimony irrelevant and excluded it. (*Id.*)

On cross-examination, Petitioner denied returning to his trailer to retrieve his service revolver and denied, further, telling Cook that someone had sold him "soap." (State's Br. on Direct Review at 21.) In rebuttal, the State called Detectives McGovern and Winistorfer to testify that Petitioner did not mention an alleged robbery attempt by Corey Williams when they spoke with Petitioner at his trailer after the shooting nor when they interviewed him later that morning at the police station. (Direct Review Order at 6; State's Br. on Direct Review at 22-23.) Nor did Petitioner ever say that either person in the van had brandished a gun or any other weapon. (*Id.*) ASA Demacopoulos also testified that in Petitioner's initial account of the shooting, he stated that he

walked up to the van, ordered Myles and Corey Williams to get out, and, when Myles started to drive off, the gun discharged.  (Direct Review Order at 5.)

The trial court did not find Petitioner's testimony credible.  Petitioner had made too many conflicting and inconsistent statements about the events of that early morning, stated the court. (Trial Tr. at 71.)  The court specifically commented on Petitioner's account of the events immediately preceding the shooting; the court found that account most unbelievable and observed that "an inadvertent shooting . . . factually couldn't have occurred the way [Petitioner] . . . said it occurred." (*Id.* at 72.)  The court noted that the physical evidence was inconsistent with Petitioner's statement that the van was headed toward him but swerved away just as he fired his gun: the bullet's trajectory was through the open driver's side window (no other windows were open or had been pierced by a bullet) before it entered Myles's chest cavity on his left side and traveled to the right side, making it far more likely that the van was passing by Petitioner when he fired.  (*Id.* at 72-73.)  The trial court also pointed out that Petitioner had tuned his police scanner to calls from Chicago, where he lived and where the shooting occurred, rather than to calls from Robbins, where he worked as a part-time police officer.  (Direct Review Order at 7.)  Although Petitioner had eventually shown police his service revolver and the empty shell casing, the trial court noted that he initially attempted to conceal the discharged cartridge in a wood pile behind his trailer and that he made no attempt to report the incident.  (Direct Review Order at 2; Trial Tr. at 70.)  The court found Petitioner guilty of first-degree murder and of attempted armed robbery.  (Direct Review Order at 8.)

At sentencing, over Petitioner's objection, the court took account of Petitioner's statement, reported in the pre-sentence investigation report, that "'if he was convicted he would see that [his attorney] never practiced law . . . again.'" (*Id.* at 8.)  In his allocution, Petitioner stood by his assertion that the killing was accidental and blamed Corey Williams for brandishing a gun. (*Id.* at 8.)  The court considered these statements, as well as Petitioner's use of his service revolver

in the commission of his crimes, as aggravating factors, and sentenced Petitioner to forty-five years in custody. (*Id.* at 8-10.) One week later, the court granted, in part, Petitioner's motion to reduce the sentence and lowered his term to forty years. (*Id.* at 10.)

Through counsel, Petitioner challenged his convictions on direct appeal, claiming that:

(I)      the State failed to prove his guilt beyond a reasonable doubt;

(ii)     the trial court's findings of facts were clearly erroneous because the court improperly relied on the testimony of Cook and White and made findings about the trajectory of the bullet without relying on a ballistics expert;

(iii)    the trial court improperly viewed Petitioner's inconsistent statements as inculpatory;

(iv)    the trial court refused to consider evidence that Petitioner was regularly drug tested and had not tested positive; and

(v)     the trial court imposed an unduly harsh sentence because it improperly considered as aggravating factors (a) Petitioner's alleged statement that, were he found guilty, he would see that his trial attorney never worked again; (b) Petitioner's employment as a police officer; and (c) Petitioner's alleged failure to accept responsibility for his actions.

(Br. and Arg. of Def.-Appellant ("Pet'r's Br. on Direct Review"), Ex. D to State Ct. R., at 18-50.) The Illinois appellate court rejected all of these claims and affirmed Petitioner's convictions in its February 11, 1997 opinion. (Direct Review Order at 20.) In his *pro se* petition for leave to appeal ("PLA") filed on March 26, 1997, Petitioner raised the same five issues. (Pet. for Leave to Appeal at 1-5.) The Illinois Supreme Court denied the petition on June 4, 1997. (Order Denying PLA, Ex. G to State Ct. R.)

## II.    Postconviction Proceedings

The procedural history of Petitioner's postconviction proceedings is considerably more confusing. Petitioner first filed a (largely incomprehensible) postconviction petition for relief on September 23, 1997. (Postconviction Pet., Ex. I to State Ct. R.) Construed generously, the petition lays out six potential constitutional claims: (1) ineffective assistance of trial counsel and appellate counsel (though he does not assert any factual basis for his allegations of ineffectiveness);

(2) excessive sentence; (3) prosecutorial misconduct based on the State's knowing subornation of perjury; (4) the unreasonable search of his car and trailer and seizure of his revolver and police scanner; (5) incomplete recitation of *Miranda* rights; and (6) prosecutorial and judicial misconduct (again, alleged generally). (*Id.* at 4, 16-27.) Additionally, Petitioner re-stated the same five claims he asserted on direct appeal. (*Id.* at 32-35) He also added various non-constitutional claims for relief based on, *inter alia*, Robbins Police Department's release of his personnel file and the fact that witness Rhonda Cook used drugs. (*Id.* at 29-31.)

A procedural mishap[7] and a number of continuances (some by agreement, others ordered by the court) delayed the State's filing of its motion to dismiss the postconviction petition until November 2, 2000. (Certified Statement of Conviction/Disposition at 12-13; Postconviction R., Ex. M to State Ct. R., at C00049.) Petitioner, through counsel, did not respond to the motion to dismiss, however, until May 11, 2007—six and a half years later. (*Id.* at C00094.) On that same day, Petitioner also filed an amended postconviction petition, alleging a violation of his *Miranda* rights and a corresponding claim of ineffective assistance of trial and appellate counsel for failure

---

[7]     As Respondent noted in one of its pleadings before this court, there was some confusion about the disposition of Petitioner's September 23, 1997 postconviction petition. (*See* Resp't's Limited Resp. [10] ¶ 3.) The trial court did not dispose of the petition within the statutorily-required 90 days and then, on April 24, 1998, Petitioner filed two more pleadings—a motion for default judgment and a petition for an evidentiary hearing. (*Id.*) Perhaps because the default motion and petition for a hearing appear to seek postconviction relief, the trial court interpreted them as a second postconviction petition, and denied it on May 1, 1998. (Confession of Error and Request for Remandment, Ex. K to State Ct. R., ¶ 6.) Though the May 1, 1998 order did not explicitly refer to the initial postconviction petition, the record shows that it was dismissed on May 1, 1998, as well. (*Id.*) The record also includes two additional postconviction petitions, filed in July 1998. (Certified Statement of Conviction/Disposition, Ex. W to Initial State Ct. R. [11], at 11.)
        Petitioner appealed the dismissal of his petition, arguing that it violated 725 ILCS 5/122-2.1, which requires the court to dismiss a frivolous postconviction petition within 90 days of its filing; a dismissal entered after the 90-day period is void. (Confession of Error at ¶¶ 7, 8.) The State recognized the error and, in August 1999, filed a "Confession of Error and Request for Remandment"; the court granted the request on September 1, 1999, thereby reinstating Petitioner's postconviction proceedings. (*Id.* at ¶ 8; Sept. 1, 1999 Order, Ex. L to State Ct. R.) The court also appointed the public defender to represent Petitioner in the postconviction proceedings in November 1999. (Certified Statement of Conviction/Disposition at 12.)

to raise the *Miranda* issue.  (*Id*. at C00104.)  From the time of filing of the state's motion to dismiss until Petitioner's response/amended petition, the state court granted more than thirty continuances. (Certified Statement of Conviction/Disposition at 14-19.)  Of those, more than half were agreed to by the parties.  (*Id*.)

Also in that interim, Petitioner initiated habeas corpus proceedings in federal court.  He filed his first habeas petition in federal court on June 12, 2000.  (Limited Resp. ¶ 7.)  Judge Manning of this court dismissed that petition without prejudice because postconviction proceedings were still pending.  (*Id*.)  Petitioner filed another habeas petition on September 3, 2004, seeking to bypass the exhaustion requirement because of the delay in the state court postconviction proceedings. (*Id*.)  On January 26, 2005, Judge Manning again dismissed the petition without prejudice, noting that the delay in the state court proceedings was largely due to Petitioner's counsel.  (*Id*. ¶¶  8, 9.)

On October 1, 2007, Petitioner filed the habeas petition at issue here—his third. (Habeas Pet. [8].)  Again, he argued that the court should waive the exhaustion requirement, and this time, the court ordered Respondent to file a limited response to address the issue.  (Oct. 10, 2007 Habeas Pet. [8]; Limited Resp. ¶ 11.)  In its response, filed October 22, 2007, Respondent noted that since the court's January 26, 2005 order dismissing the second habeas petition, the state court proceedings had been delayed by "at least 20 additional 'continuances by agreement,' as well as three continuances by [P]etitioner's motion."  (Limited Resp. at 8; June 26, 2008 Minute Order [18] at 2.)   Respondent also observed that there is no constitutional right to counsel in postconviction proceedings and, because Petitioner's counsel appeared to be the only impediment to Petitioner's postconviction case, Petitioner could simply fire his attorney and request a prompt hearing.  (June 26, 2008 Minute Order at 2.)

In her June 26, 2008 ruling, Judge Manning observed that, although Petitioner had made some efforts to proceed *pro se*, at the time of the ruling, the docket reflected that Petitioner was still represented by Attorney Frederick Cohn, and that counsel was substantially responsible for the

state court delays. (*Id.*)  The court again declined to waive the exhaustion requirement, and, instead, the court stayed the federal proceeding and advised Petitioner to seek to reinstate it when his postconviction petition had completed one full round of state court review.  (*Id.* at 2-3.)

Two days later, on June 30, 2008, the state court conducted a hearing on Respondent's motion to dismiss the postconviction petition; Mr. Cohn represented Petitioner at the hearing. (Hrg. Tr., Ex. N State Ct. R., at AA-19 (June 30, 2008).)  The state court granted the State's motion to dismiss, and, at Mr. Cohn's request, appointed the Office of the State Appellate Defender to represent Petitioner in his appeal.  (*Id.* at AA-21; Aug. 8, 2008 Order, Ex. O to State Ct. R.)  A little over a year later, however, Petitioner sought leave to proceed with his appeal *pro se*, apparently because of the public defender's unwillingness to raise certain issues on appeal.  (Mot. for Pet. to Proceed on Appeal *Pro Se*, Ex. P to State Ct. R.)  The appellate court granted that motion on September 18, 2009 (Sept. 18, 2009 Order, Ex. Q to State Ct. R.), and Petitioner filed his *pro se* brief on October 21, 2009.  (Br. and Arg. for Def.-Appellant ("*Pro Se* Postconviction Appellate Br."), Ex. R to State Ct. R.)  In his brief, Petitioner claimed various purported constitutional errors, including that: (1) he received the State's motion to dismiss with a fraudulent, handwritten date; (2) he was forced to proceed with counsel against his wishes; (3) the order notifying him of the dismissal of his postconviction petition arrived late, thereby preventing him from timely filing a motion to reconsider; (4) he suffered ineffective assistance of trial and appellate counsel in his postconviction proceedings; and (5) the prosecution's introduction of a statement by Corey Williams violated the Confrontation Clause.[8]  Just days after Petitioner filed the brief, the appellate court vacated the order allowing Petitioner to proceed *pro se*, struck Petitioner's *pro se* postconviction

_____

[8]     Petitioner's postconviction appellate brief did not expressly articulate a Confrontation Clause violation, and instead, merely referenced prejudice resulting from Corey Williams's absence at trial. (*Pro Se* Postconviction Appellate Br. ¶ 12.) In his postconviction petition, however, Petitioner did expressly allege a Confrontation Clause violation (Postconviction Pet. at 22), and because the court liberally construes *pro se* pleadings, it will treat Petitioner's appellate brief as raising the same claim.

appellate brief, and reappointed the Office of the State Appellate Defender. (Oct. 26, 2009 Order, Ex. S to State Ct. R.)

Then, on November 25, 2009, the parties filed an agreed motion for summary disposition in which the state appellate defender concluded that the issues raised by Petitioner in his postconviction appeal lacked merit. (Am. Agreed Mot. for Summ. Disposition, Ex. T to State Ct. R., ¶ 9.) Also in that motion, the public defender requested an amendment to Petitioner's mittimus, which erroneously reflected three convictions for first-degree murder instead of one. (*Id.* ¶ 10.) The court granted the motion and amended the mittimus on December 3, 2009. (Dec. 3, 2009 Order, Ex. U to State Ct. R.) Petitioner then filed his *pro se* postconviction PLA on December 19, 2009; the Illinois Supreme Court issued an order denying the PLA on March 24, 2010. (Pet. for Leave to Appeal, Ex. V to State Ct. R.; Mar. 24, 2010 Order, Ex. W to State Ct. R.)

Having submitted his postconviction petition to one complete round of state court review, Petitioner filed a supplemental habeas petition. Judge Manning interpreted that pleading as a motion to lift the stay on the federal habeas proceedings and granted that motion on April 26, 2010. (Supplemental Habeas Pet. [20]; Apr. 26, 2010 Minute Order [23].) Respondent filed its response to the habeas petition on August 16, 2010, urging the court to dismiss the petition on the basis that all of Petitioner's claims either fail to raise a constitutional issue or are procedurally defaulted. (Resp't's Answer [33] at 16.) In addition to the reply he filed on September 3, 2010, Petitioner also filed a motion for default judgment on January 10, 2012, citing Respondent's "excessive inordinate delays" and asking the court to "remand this cause for further consideration." (Pet'r's Reply [36]; Pet'r's Mot. for Default J. [41].)

## DISCUSSION

In its answer to the habeas petition, Respondent addresses both the claims Petitioner asserted in his third habeas petition, filed October 1, 2007, and those asserted in the supplemental habeas petition filed on April 26, 2010. In the interest of construing liberally Petitioner's *pro se*

filings, the court will also address the claims asserted in both filings, namely that:

(I)     Petitioner suffered prejudice as a result of the inordinate delay in his postconviction proceedings;

(ii)    postconviction trial and appellate counsel both provided Petitioner with ineffective assistance of counsel;

(iii)   the postconviction trial court erred in dismissing his initial petition after the passage of the statutorily-mandated 90-day period and in "pressur[ing]" him to retain counsel;

(iv)    Petitioner's right to confront witnesses was violated by the prosecution's introduction of Corey Williams's statement; and

(v)     the State improperly presented the unreliable testimony of Rhonda Cook.

(Habeas Pet. at 5(a)-6(b); Supplemental Habeas Pet. at 5-7.)[9]  For reasons explained below, the majority of Petitioner's claims either fail to raise an issue of constitutional law or are procedurally defaulted; the only claim that concerns a matter of constitutional import and has not been procedurally defaulted—the Confrontation Clause claim—is without merit.

## I.      Standards for Habeas Review

As Petitioner is, by now, well aware, a federal court's ability to grant a writ of habeas corpus is limited by the exhaustion doctrine; he must "exhaust the remedies in the court of the state" before this court can consider the merits of his habeas claims.  28 U.S.C. § 2254(b)(1)(A).  The exhaustion doctrine allows the State "'the opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'"  *Johnson v. Pollard*, 559 F.3d 746, 751 (7th Cir. 2009) (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)).  To satisfy the requirement, Petitioner must "fairly present" his claims through "'one complete round of the state's established appellate review process.'"  *Byers*

---

[9]     In his supplemental habeas petition, Petitioner also asserts a claim based on an alleged delay in his receipt of a court order and a claim based on the fact that a law student, practicing pursuant to a Rule 711 license and under supervision, was allowed "to remove the motion to dismiss improperly."  (Supplemental Habeas Pet. at 6.)  Petitioner has not pleaded either of these claims with sufficient specificity nor does either claim raise an issue of constitutional or federal law.  Thus, the court will not discuss them further.

*v. Basinger*, 610 F.3d 980, 985 (7th Cir. 2010) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)).  Adequate presentation requires Petitioner to have presented "both the operative facts and the legal principles" underlying each of his claims.  *Pole v. Randolph*, 570 F.3d 922, 934-35 (7th Cir. 2009).  Failure to adequately present a claim leads to procedural default and prevents the court from entertaining the claim.

Once a petitioner has satisfied the exhaustion requirement, the court may consider the merits of his or her claims.  The Antiterrorism and Effective Death Penalty Act ("AEDPA") permits a federal court to grant a writ of habeas corpus only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d); *Morgan v. Hardy*, 662 F.3d 790, 797 (7th Cir. 2011).  Under the first prong, habeas relief may be granted only where the state court applied a rule that "contradicts" Supreme Court precedent or where it "reached a different outcome based on facts 'materially indistinguishable'" from those before the Court.  *Morgan*, 662 F.3d at 797 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).  Under the second prong, a petitioner must show that the state court either unreasonably applied Supreme Court precedent where it should not have been applied or unreasonably refused to apply the precedent where it should have been applied.  *Id.* (citing *Virsnieks v. Smith*, 531 F.3d 707, 713 (7th Cir. 2008)).  The state court's application of a rule is not necessarily unreasonable simply because the reviewing court finds the application "substantively incorrect."  *Barrow v. Uchtman*, 398 F.3d 597, 602 (7th Cir. 2005) (citing *Williams*, 529 U.S. at 411-12.)  As the Seventh Circuit recently noted, satisfying either of AEDPA's two prongs requires a petitioner to meet "demanding standards."  *Atkins v. Zenk*, 667 F.3d 939, 944 (7th Cir. 2012).

## II.     Noncognizable Claims

The majority of the claims that Petitioner raises in his habeas petition fail to allege a violation

of the Constitution or of federal law and are, therefore, noncognizable under habeas review. *See* 28 U.S.C. § 2254(a) (stating that a federal court may entertain a habeas petition from a person "in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or law or treaties of the United States"). First, Petitioner seeks relief on the basis that the inordinate delay in the adjudication of his postconviction petition prejudiced him. (Habeas Pet. at 5A.) There is no denying that the disposition of Petitioner's postconviction case took far too long. Petitioner asserts that the delay was caused by "unexplained continuances attributable to the [S]tate," but the record shows that the majority of the continuances requested throughout the decade-long adjudication were either asked for or agreed to by Petitioner's counsel. (*See* Certified Statement of Conviction/Disposition at 10-22.) Even if the state were fully responsible for the delay, that fact alone would not entitle Petitioner to a writ of habeas corpus. "'[D]elay in receiving a ruling on a discretionary state collateral appeal is not a ground for federal habeas corpus relief.'" *Jackson v. Duckworth*, 112 F.3d 878, 880 (7th Cir. 1997) (quoting *Montgomery v. Meloy*, 90 F.3d 1200, 1206 (7th Cir. 1996)). Undue delay in a postconviction proceeding, no matter how excessive, has nothing to do with the legitimacy of the underlying criminal conviction. If such delay were grounds for relief, "then a state prisoner would be entitled to release from confinement . . . even though his state criminal trial and direct appeals were constitutionally flawless." *Id.* A writ of habeas corpus contemplates no such remedy.

Nor can the court grant Petitioner relief on the basis that postconviction counsel provided him ineffective assistance. Petitioner claims that his postconviction trial counsel colluded with the state to cause the aforementioned delay, failed to appear in court on multiple occasions without explanation, and unreasonably refused to assert certain arguments in the postconviction proceedings despite Petitioner's urging.[10] (Habeas Pet. at 5A; Supplemental Habeas Pet. at 5-6.)

---

[10] Petitioner also attempts to argue ineffective assistance of postconviction trial counsel
(continued...)

Similarly, he alleges that his postconviction appellate counsel failed to provide effective assistance when she refused to raise certain issues on appeal. (Supplemental Habeas Pet. at 6.) The Constitution, however, does not require the appointment of counsel in postconviction proceedings. *Resendez v. Knight*, 653 F.3d 445, 446-47 (7th Cir. 2011) (citing *Coleman v. Thompson*, 501 U.S. 722, 756-57 (1991)). "And where there is no constitutional right to counsel, there cannot be constitutionally ineffective assistance of counsel." *Wyatt v. United States*, 574 F.3d 455, 459 (7th Cir. 2009) (citing *Coleman*, 501 U.S. at 752). Therefore, Petitioner's ineffective assistance of postconviction counsel claims must fail.

Petitioner also alleges a claim, titled "Trial Court Abusive Discretion," in which he asserts that the postconviction trial court erred because it (1) "lost it's [sic] authority to act" when it dismissed his initial postconviction petition after the passage of the statutorily-mandated 90-day review period and (2) "pressure[d]" him to retain counsel. (Habeas Pet. at 6.) This claim alone does not support relief. The state court's failure to meet state law deadlines does not raise any federal constitutional concern. In any event, there is no basis for the conclusion that the delay resulted in any substantive prejudice; the state court recognized its error and reinstated the petition. (Confession of Error ¶ 8; Sept. 1, 1999 Order.) Moreover, any "pressure" to retain counsel was not improper; as Petitioner himself recognizes, navigating the justice system is complicated and effective counsel enhances the possibility of success. Petitioner remained free to decline the assistance of counsel and ultimately did so. This claim is dismissed.

---

[10](...continued)
based on counsel's alleged collusion in an incident—the details of which are fuzzy—in which Petitioner alleges the State fraudulently backdated its motion to dismiss the postconviction petition. (Supplemental Habeas Pet. at 5.) Petitioner appears to claim that an assistant state's attorney handwrote the date Nov. 2, 2000 on the motion to dismiss, but that the motion was actually filed later. The court is confused by the allegations, particularly given that the copy of the motion to dismiss in the postconviction record displays an official file stamp of the clerk of the circuit court dated November 2, 2000. (Postconviction R., Ex. M to State Ct. R., at C00049.) Nevertheless, because, as explained in text, the Constitution does not guarantee a right to counsel for postconviction proceedings, the court need not address the matter further.

### III. Procedural Default

Petitioner also alleges a due process violation based on the admission of Rhonda Cook's testimony at trial, arguing that (1) her testimony was coerced and (2) she is a mentally unfit drug addict. This claim is procedurally defaulted. As stated, exhaustion doctrine requires Petitioner to fairly present the facts and legal theories underpinning each of his claims through one complete round of state court review. *Pole*, 570 F.3d at 934-35. Failing to do so results in procedural default. *Id.* A federal habeas court may only review the merits of a procedurally defaulted claim if the petitioner can show cause for the default, and resulting prejudice, or demonstrate that a failure to review the defaulted claim will result in a "fundamental miscarriage of justice." *Coleman v. Hardy*, 628 F.3d 314, 319 (7th Cir. 2010) (citation omitted).

On direct review, Petitioner did challenge the trial court's apparent reliance on certain parts of Cook's impeached but unperfected testimony,[11] yet no where in his pleadings on direct review did Petitioner allege coercion, mental unfitness, or drug addiction in relation to Cook's testimony. Petitioner does make these allegations in his postconviction petition but not elsewhere. As noted earlier, his *pro se* postconviction brief on appeal was struck when the appellate court reappointed

---

[11]  At trial, Cook denied signing a written statement on September 4, 1992, or testifying before a grand jury on September 17, 1992, that Petitioner went out on the night of the shooting looking to purchase drugs. (Direct Review Order at 4.) To impeach Cook's trial testimony, the State introduced the statement ASA Demacopoulos wrote and Cook signed on September 4, 1992, but did not present a transcript of the grand jury proceedings. (*Id.*) In its review of the conviction, the appellate court found "no indication in [the] record that the trial court considered the unperfected impeachment of Cook, or gave credence to unproved allegations concerning her grand jury testimony." (*Id.* at 11-12)  The appellate court noted, however, that the trial court may have considered Cook's statements to ASA Demacopoulos concerning Petitioner's intent to buy drugs as substantive evidence. (*Id.* at 12.)  Any such consideration would have been inappropriate since, as the appellate court observed, a witness's prior inconsistent statement is admissible as substantive evidence only where it concerns a matter of the witness's personal knowledge. (*Id.* at 12) (citing 725 ILCS 5/115-10.1(c)(2)).  Cook's statement that she believed Petitioner attempted to purchase drugs cannot be used to show that he actually attempted to purchase drugs, because Cook did not witness any such attempt, reasoned the court. (*Id.* at 13.)  But even if the trial court had improperly relied on the written statement, any error was harmless, stated the appellate court; ASA Demacopoulos testified that Petitioner admitted to her that he tried to buy cocaine, and testimony by White and Larry Williams corroborated that fact. (*Id.* at 13.)

the appellate defender, who then entered into an agreed motion for summary disposition dismissing the petition as meritless.[12] (Am. Agreed Mot. for Summ. Disposition ¶ 9.) And in his postconviction PLA, Petitioner makes reference to Cook's alleged mental illness only as it affected her testimony before the grand jury. (Postconviction PLA at ¶ 4.) In other words, Petitioner did not fairly present his challenge to Cook's trial testimony to one complete round of state court review, and thus, the claim is procedurally defaulted and requires dismissal.

A federal habeas court may review the merits of a procedurally defaulted claim if the petitioner can show cause for the default, and resulting prejudice, or that a "fundamental miscarriage of justice" would otherwise occur, but Petitioner cannot satisfy either of those standards. The evidence of his guilt is substantial even without Cook's testimony: Petitioner told ASA Demacopoulos that he attempted to buy drugs from Myles and Corey Williams, that they sold him bad drugs, that he went to his trailer to retrieve his service revolver before setting out to get his money back, and that when he found Myles and Corey and demanded his money, they attempted to drive off, and he fired his revolver at the van. (Direct Review Order at 4-5.) The testimony of White and Larry Williams corroborated this version of events. (*Id.* at 13.) Moreover, after the incident, Petitioner proceeded to his house, ditched the empty shell casing in a wood pile, parked his van a block from his trailer, and, once inside, listened to his police scanner and made no attempt to contact the authorities (State's Br. on Direct Review at 9; Direct Review Order at 2); these are not the actions of a person who acted in self-defense. Notably, in his initial interactions with local law enforcement and with the State's Attorneys Office, Petitioner never offered the self-defense theory that he ultimately adopted. The trial court observed that Petitioner had edited and re-edited his version of events so many times that his trial testimony simply could not be believed.

---

[12] Petitioner could argue that his procedural default should be viewed as a product of counsel's decision, but the court notes that his *pro se* postconviction brief also made no mention of any problems in Cook's testimony.

Even if the court were to reach this claim on the merits, the court would have no basis for finding the trial court's determination unreasonable in light of the evidence. Therefore, Petitioner cannot show that prejudice, much less a fundamental miscarriage of justice, results from this court's decision not to review the merits of his procedurally defaulted claim.

## IV.    Merits

The only remaining claim is that the prosecution's introduction of Corey Williams's statement violated Petitioner's rights under the Confrontation Clause of the Sixth Amendment. (Habeas Pet. at 5(b)-6.) Respondent argues that this claim, too, is procedurally defaulted because Petitioner did not raise it in his postconviction appeal; instead, his counsel filed an agreed motion for summary disposition, dismissing the appeal. Given the unique procedural history at play here, the court is reluctant to hold the claim procedurally defaulted on that basis. Petitioner sought, and was granted, the court's permission to proceed *pro se* with his postconviction appeal, but after he filed his brief, the court struck it, vacated its prior order allowing Petitioner to proceed *pro se*, and reappointed the appellate defender. The appellate defender then filed the agreed motion, stating simply that she had "received the *pro se* brief, ha[d] reviewed the issues raised in the *prose* [sic] brief, and ha[d] concluded that they do not have merit." (Am. Agreed Mot. for Summ. Disposition ¶ 9.)

Counsel's motion is arguably akin to an *Anders* brief. *See Anders v. California*, 386 U.S. 738, 744 (1967) (stating that court-appointed attorneys make seek permission to withdraw from representation of the client where, after "conscientious examination" of the record, they determine any appeal would be "wholly frivolous"). What the agreed motion for summary disposition filed here did not include, however, is any explanation of the nature of the case, or of any potential claims, in order to demonstrate to the court and to Petitioner that counsel had fully evaluated the record. *Compare United States v. Palmer*, 600 F.3d 897, 898 (7th Cir. 2010) ("[A]n *Anders* submission must 'identify, with record references and case citations, any feature of the proceeding in the [lower] court that a court or another lawyer might conceivably think worth citing

to the appellate court as a possible ground of error.'") (quoting *United States v. Edwards*, 777 F.2d 364, 366 (7th Cir. 1985)).  While such a discussion would have been helpful—and may have addressed some of Petitioner's confusion and suspicion concerning his postconviction appeal—any error is harmless since, as discussed below, the appeal is indeed meritless.  But because Petitioner did assert a Confrontation Clause claim (albeit sparsely) through all stages of his postconviction review, the court will review that claim on its merits.

The record before this court contains few details concerning Corey Williams's statement; it is not clear whether the statement was made to police or to ASA Demacopoulos, and Petitioner does not describe the content of the statement.  He asserts only that the introduction of the statement, without the presentation of Corey Williams as a witness at trial, violated the Confrontation Clause.  *See Crawford v. Washington*, 541 U.S. 36, 53-54 (2004) (holding that the Confrontation Clause bars admission of a witness's out-of-court, testimonial statement unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness). Though the court cannot determine whether Corey Williams's statement could be considered "testimonial" without further developing the record, if the statement were testimonial, its admission would have been improper since Petitioner, in fact, had no prior opportunity to cross-examine Corey.  Yet not all testimony admitted in violation of the Confrontation Clause necessarily requires relief; the Seventh Circuit reviews Confrontation Clause violations for harmless error. *United States v. Walker*, 673 F.3d 649, 658 (7th Cir. 2012) (citation omitted).  Here, the trial court did not even mention Corey Williams's statement in the explanation of its guilty verdict and there is no other evidence the statement had any effect on the court.  In light of the overwhelming evidence demonstrating Petitioner's guilt, as previously explained, the introduction of the statement, even if Petitioner could show it violated the Confrontation Clause, was harmless beyond a

reasonable doubt.  Therefore, the court dismisses this claim.[13]

## CONCLUSION

For the reasons explained herein, the court dismisses the original habeas petition [8] and the supplemental habeas petition [20].  Furthermore, the court declines to issue Petitioner a certificate of appealability, because he has failed to make "'a substantial showing of the denial of a constitutional right.'" *Gonzalez v. Thaler*, ___ U.S. ___, 132 S. Ct. 641, 648 (Jan. 10, 2012) (quoting 28 U.S.C. § 2253(c)(2)); *see also United States v. Fleming*, ___ F.3d ___, 2012 WL 1292598 at *3 (7th Cir. Apr. 17, 2012) (stating that a habeas petitioner must "demonstrate that reasonable jurists would find the district court's assessment of his constitutional claims debatable or wrong" for a certificate of appealability to issue) (quoting *Tennard v. Dretke*, 542 U.S. 274, 281 (2004)).

ENTER:

Dated:      May 21, 2012

_____

REBECCA R. PALLMEYER
United States District Judge

---

[13]      The court also notes that, had a state postconviction court examined this claim, it likely would have held it procedurally defaulted since Petitioner could have, but did not, raise it on direct appeal.  *See People v. Harris*, 224 Ill. 2d 115, 124, 862 N.E.2d 960, 966 (2007). Dismissal of a claim based on adequate and independent state procedural grounds forecloses federal habeas review of that claim.  *Kaczmarek v. Rednour*, 627 F.3d 586, 591 (7th Cir. 2010).